Good morning, your honors. John Reitman appearing for Bradley D. Sharp, the trustee of the Liquidating Trust of the State Financial Mortgage Fund, which is a bankruptcy estate. Before I start, Mr. Gabriel is here. He's representing the State Financial Inc., another appellant, and we will be splitting our time, so I will try not to take more than seven and a half minutes of the court's time here today. Okay. Are you going to reserve any rebuttal time? I think I'll let Mr. Gabriel do that, your honor. He'll reserve the rebuttal? Yes. All right. Go forward, then. May it please the court. In 2006, a borrower accused State Financial, and I'll just call it EFI, of violating some Department of Real Estate regulations. EFI was concerned about that, and EFI and EFMF hired Bryan Cave to do a complete compliance review. Essentially, please tell us if we're doing anything that's wrong. Explain to us how to cure it and help us cure it. In other words, what should we do? The response was that for the next nearly two years, Bryan Cave committed malpractice at every stage of the engagement by giving the client's advice that no competent lawyer would have given. As Bryan Cave's counsel acknowledged in the court below, we are worse than any lawyers in existence, according to these allegations. And those are the allegations of the complaint, and they are putting you in debt. How would the best advice have saved a Ponzi scheme from collapsing? Well, first, your honor, there is no Ponzi scheme. There's been no determination of a Ponzi scheme. Let me just focus. There are a couple of places in – I'll be honest with you, I can't keep track of whose complaint. I don't know if it's your complaint or his complaint, but this is the EFI complaint. And, you know, there are a couple of passages that your opposing counsel point us to that do have the flavor, at least, of a Ponzi scheme. I'm looking at one in particular. This is paragraph 78, which says that since December 2006, investor money intended for development and construction purposes was improperly diverted to pay interest due to investors and to pay expenses and forbearance fees. There's another allegation that says that the entity failed to pay investors' monthly interest payments from appropriate sources and used investor money to pay interest payments to other investors. And so that just has the flavor of new money coming in is being used to pay the obligations to the old investors. It may in some context, your honor, but keep in mind that these are all based on what Brian Cave is asserting was happening. Because Brian Cave – No, no, I just read from one of your guys' complaints. I understand, but the context of that complaint is this was what Brian Cave was telling the clients when it finally made disclosure to them. But the fact that they may have been doing something unlawful, and let's assume they were for the sake of this discussion, does not mean that they were doing so knowingly or that that in and of itself constitutes a Ponzi scheme. I'll give you an alternative example, which is the client doesn't know it's improper. He's trying to save properties for the benefit of all of the investors. And he thinks this is a good way to do it. And no one suggested to him that it's a bad way to do it. And it may well have been a bad way. That's why EFI and EFMF went to Brian Cave and said, hey, I've got an allegation. Tell me what I'm doing wrong. How do I cure it and help me cure it? This is separate and apart from the actual operation of the business. In any event, what happened here, if I've answered the court's question, is that Brian Cave, despite its admission, worst lawyers in existence, took the position below that its conduct was irrelevant. And what it concluded was that because of a non-preclusive guilty plea by Guth and Yaguta, the managers, that it was conclusive that they were engaged in a fraudulent scheme and knowingly lying to investors. And that's not the only inference to be drawn. There are other inferences to be drawn. In any event, what happened is that the court below accepted that argument and in so doing adopted a near strict liability standard for either impari delicto or unclean hands. It's still not clear to me which it was. Because what the court said was the test is not how bad was Brian Cave. The test here is how bad were Guth and Yaguta. Well, if that's the case, it was looking at only one issue, Guth and Yaguta. And according to the court, what it's saying is if I decide the plaintiff's engaged in some wrong, that's it, end of discussion. It's over. Impari delicto must apply. Unclean hands must apply. Usually, though, when somebody's making the argument you're making, the court has to look direct. And when we look direct here, do we see a basis for the argument you're making? Absolutely. And if the court will allow me, I'll tell you how we get there. First, you've got to distinguish. This case is not about EFI or EFMF lying to investors. That's a transaction. This is about a different transaction, which is EFI, EFMF, going to lawyers and saying, hey, I'm not sure what's going on here. Help me figure it out. Help me fix it. Help me make it right. And therein lies the problem because it's clear that the lawyers didn't do that. And last week we gave the court a supplemental filing where there's some interesting dicta, where the court applied impari delicto in Peterson v. Winston and Strong, and it sort of addresses this issue. Clients often hire law firms for advice about what to do, which, if you look at the complaint, it's throughout that complaint. When the client thinks something may be amiss, desires to address its errors, fully discloses all facts to its attorney, but the attorney nevertheless gives incompetent advice, the attorney cannot defend by asserting that the client already knew the facts. The fault would not be equal because the client would have hired the law firm for legal expertise rather than factual information. And that is precisely the case here. In this case. How about the allegation that one of the principals used a good sum of money to pay the obligations to the ex-husband? What do you do about that? You know, that's not in our pleading, Your Honor, and I don't know that that's the case, and I don't know, but let's just take it. I thought it was in one of these complaints. It may well be, and it probably is in the EFI complaint, but let's take that as it is. If you're the manager of EFI and you have an interest in EFI and you're entitled to compensation, that may well be some of the compensation that a principal believes he or she was entitled to get. The point is it's premature here on simply a pleading stage to conclude what was going through someone's mind, what their intent was, whether they were knowingly engaging in a fraud. Because that's what, in essence, the two equitable doctrines require intent, specific intent to do something, actual knowledge of things. And at a pleading stage, that's a very, very harsh result to knock a case out. You think someone, if I remember the allegation, it was that the person got some kind of an increase in the line of credit or something for $1.1 million and took $1.1 million and just paid it to this other obligation. It obviously had nothing to do with the conduct of the entity. It was a purely personal obligation. Nobody could think that that was okay. So I don't know why you're saying that, well, we don't know if it was done knowingly or with the right intent. It just seems to me that's an obviously fraudulent transaction. I can't answer the question, Your Honor, because it's not in my pleading and I haven't even thought about it. What I can address is- You knew what was going to be the questions that somebody was going to have to answer to resolve this case, didn't you? Insofar as our pleading is concerned, yes, Your Honor. You have to remember that the State Financial Inc. is not the same as the State Financial Mortgage Fund. The State Financial Mortgage Fund is an independent entity that was an investment vehicle. And one of the things that we've asked the court to do is give us leave to amend the complaint because I'm not sure that any of the information that might have been known to Guth and Yeguda is imputable to EFMF. But that's for another day if the court decides that it's going to give us leave to amend. Don't we look, though, not at what I might think or what you might think, but what the court that issued the order could reasonably think based on the facts before it? Well, what the court below was obligated to do was correctly apply the test for unclean hands in par delicto, either of which it did. And it was supposed to look at the facts and the inferences to be drawn therefrom and give every benefit to the plaintiff. And I don't believe that was done here. I believe there are other explanations. And I believe that this is just simply premature to be imposing a total bar to these claims. And if the court will. So if I look at the doctrine of unclean hands in this particular matter, it seems to me you're really saying to me the first test of examining analogous case law has been met. Maybe the last test, the relationship of the misconduct to the injuries has been met, but the nature of the misconduct itself has not been met as a question of law. Is that what you're telling me? Well, I think what I'm telling the court is that for in par delicto, there is a requirement that you balance the moral fault. Well, you didn't answer my question. Those are the elements of what I've got to determine whether this court could apply the clean hand doctrine. Well, under unclean hands, the question is whether the plaintiff's wrongful conduct arises in the same transaction about which the plaintiff complains and the plaintiff's wrong infects the relationship between the parties. And as the court said in Brown v. Grimes, where a party is not guilty of inequitable conduct toward the defendant in the transaction, that's vis-a-vis EFI, EFMF, and Brian Cave, his hands are as clean as the court can require. There's no inequitable conduct by EFI and EFMF vis-a-vis Brian Cave. And that also is not the end of the test. And the question is because there is also a judicial integrity issue here. Do you want to give your co-counsel some time? Because you've gone down to three and a half minutes. Well, I do, Your Honor, certainly. Thank you. Did you want to take some time or did you all just want to do this on rebuttal? I'm going to reserve all. All for rebuttal? Okay, thank you. And do I only have three and a half minutes left? That's all you've got. Okay. Good morning. Excuse me. Good morning, Your Honors. My name is Kevin Rosen. I apologize in advance for my voice. I was afraid I might not have any before I was preparing yesterday. I represent Brian Cave, LLP, in this matter. And I think it's probably useful to begin my argument with where the court left off in terms of the questions to Mr. Reitman. First, I do think it's important to distinguish between two different doctrines here, unclean hands and imperi delecto. Why? Because among other things, for example, unclean hands, which I don't think is in dispute and certainly is clear in California law, focuses only on the plaintiff's conduct. We know from the Kendall-Jackson case, which is California law, which governs here, that unclean hands, and I'm quoting from the court, need not be a crime or actionable tort. It's conduct violating, among other things, good faith. So it is most definitely not a specific intent test for unclean hands, as Mr. Reitman suggests. That's completely inconsistent with California law. Moreover, Kendall-Jackson makes clear that even consciousness of the misbehavior is not necessarily required. And if you think about it, if you look at the Blaine and Chapman cases, it's very clear that that's true. Think about Chapman, which was the public official in San Diego, who was advised by county council that as long as he refused himself from voting, the involvement in one of the matters was not a conflict of interest. And not only did that lawyer, and there's no dispute, not only did that lawyer advise the official of that fact, but then reaffirmed that that advice was correct. And notwithstanding the fact that this official was specifically advised by county council in an area that was described by the court as complex regulatory matters of the conflicts of interest, notwithstanding that, the court found that unclean hands applied. Let me tell you where I'm at, because I think opposing counsel nicely laid out the two different scenarios that you have to decide which one is pleaded in the complaint. If this is a situation in which the client becomes aware that they're doing something wrong and they go to your client, the law firm, for advice on how to fix it, it doesn't seem to me you get to invoke the unclean hands defense in that context. On the other hand, if in fact what they were doing was engaging in a Ponzi scheme that everybody would know you can't do, and they certainly didn't go to your client to help fix that, then of course you can raise the unclean hands defense. It just seems to me it's that simple. You've pointed us to a few what I would call isolated allegations and some fairly lengthy complaints that, on the whole, I'm not sure they do paint the picture of these were people engaged in a Ponzi scheme. So maybe you can focus me in better on why you think these complaints lead only to the conclusion that these entities were just pure and simple Ponzi schemes. Sure. I'd be happy to. I would say respectfully, Your Honor, and I'll come back to it if there's time, that I would respectfully disagree with the proposition that if a client is engaged in fraud, irrespective of whether they come to counsel or whatever unclean hands they're engaged in, irrespective if they come to counsel for advice, it precludes the application of the doctrine. So once you, as a client, once you've engaged in any wrongdoing whatsoever, you go in good faith to a lawyer to get advice on how to fix it, you never will be able to sue them for malpractice, no matter how bad their advice to you is because you've sort of tainted yourself forever. Is that your position? Well, I'm reluctant in the abstract to say never, never say never. Well, I hear you saying basically you just forfeit any claim. You go to a lawyer for advice on how to fix a problem. If you've engaged in any wrongdoing in the past, the lawyer gives you bad advice on how to fix the problem, you're just out of luck. Don't come into court. That's the holding of Chapman, Your Honor. That's precisely what Chapman holds. But anyway. Well, let me ask you this before you get on to the other question. Why does Unclean Hands or In Perry Dill apply against a trustee? I don't read California case law suggesting that at all. In fact, the one case we've got is that 1935 California Supreme Court case that we relied on in O'Melveny that says those kinds of defenses don't apply against receivers, and I don't see any reason why receivers are differently situated from trustees in bankruptcy as far as public policy. So maybe you could address that before. Sure. I'll address that, too. I would say, Your Honor, Peregrine holds. Footnote 14 is a complete nonanswer to that question. Well. It just refers us to Section 541, which is what points us to state law. And I'm saying as a matter of California state law, we held in O'Melveny that those kinds of defenses don't apply against receivers. So I'm not seeing any reason why we wouldn't extend O'Melveny's holding to bankruptcy trustees. Well, two big issues here. What I'd like to do is answer your first question and make sure I give myself enough time to answer the second question with respect to O'Melveny. I will tell you on the O'Melveny question, there's a fundamental difference between receivers and trustees, particularly when one looks at Section 541 of the Bankruptcy Code, which the O'Melveny Court, among many other things, didn't have occasion to look to. And every circuit, eight of them, that has addressed the question you've posed has come out the other way. No, they have not. I'm not talking about federal law overriding state law. Okay? Forget about that. That's the supposed circuit that everybody thinks O'Melveny created. I'm talking about as a matter of California law, right? Because that's what 541 does. It says go look to state law to see the nature of the property interest that is being assumed, right? And I'm saying what we held in O'Melveny was not that as a matter of federal law, unclean hands or inferior delicto can't apply against receivers. We said that's what we see California law telling us to do. So I'm asking you, why wouldn't California courts extend that rationale to bankruptcy trustees? Well, first of all, it was in camera. It was an estoppel case. O'Melveny was an estoppel case, which is a very different analysis than unclean hands. Moreover, we do have California law. The only California case to address the question of whether or not unclean hands should apply to trustees is Paragrine. And Paragrine said yes. I'm telling you, footnote 14 is the full sum and substance of the analysis on that point, and it makes no sense. Well, but the Paragrine case also adopts four of the opinions, certainly cites to them with relative enthusiasm, four opinions, four of the circuits, of the eight circuits, which uniformly, without exception anywhere in the country, have held. And those circuits you say were interpreting California law? No, what I'm saying is those circuits. They're dealing with federal law overrides state law. But you have to start with Section 541, which says the trustee stands in the shoes of the estate at the time, at the commencement of the action. So the trustee is in no better position than EFI was. And as a result, as every circuit interpreting Section 541, consistent with California, and Paragrine has said, is that the doctrines of unclean hands, and in Paraglito, do apply to trustees. But I want to come back to it. I want to make sure I leave myself enough time to answer your other question. I'm not, because this is an important question, and I think it would have far-reaching implications if this Court were to come out the way you're suggesting in terms of the other circuits. But let me, if I may, answer your question about knowing conduct, even though, again, as I say, I don't think the testifying of clean hands under California law is this sort of knowing conduct that you are inquiring about, but it's there anyway. So rather than debate that question, let me explain how it's much more than isolated. There are many instances where the complaint has alleged that Guth and Yaguta were doing all these problematic things. You alluded to that in your earlier question. But the complaints, both complaints, then go on to do are the following. And I'm going to put the guilty pleas aside for a second, although, candidly, I think that's dispositive in and of itself as well, given the nature of the crimes and the elements of the crime, the willfulness that they pled to. And we see that equally as well in California law in Chapman, I believe, where the Court looked to guilty pleas. But let me put guilty pleas aside and just focus on the complaint for a minute. We have in both complaints allegations that Brian Cave advised EFI and EFMF, and I'm quoting now, from both complaints, to continue to operate in violation of state and federal securities and real estate laws, rules, and regulations, and that they did so. That's in the record, page 323 of the EFI complaint, and their introduction is paragraph 111 of the EFMF complaint. Then both complaints allege Brian Cave did a compliance review, which revealed that, revealed is their word, that, quote, the offering materials and business practices, in fact, violated various state and federal laws, rules, and regulations. That's their words. Then both complaints go on to talk about how Brian Cave disclosed the results of that compliance review. Then both complaints go on to talk about how Brian Cave then, quote, advised them to continue to conduct business as usual and that it should not change its business practices, and then how both went on to do so. So when Brian Cave allegedly does a compliance review, tells them they're violating the law, and advises to continue to conduct business the way they've been doing in violation of law, and then they go ahead and continue to do that, that's knowing. That's one example. I think that doesn't help you in the least, it seems to me, because the allegation is that your client said, we've identified these problems. We got it. We're on top of it. We're fixing it. And in the meantime, you can continue to conduct business as usual because, you know, they're not the, whatever, Department of Real Estate's not going to crack down on you. Right. Their allegation is you can continue to violate the law because nobody's going to crack down on you. But, no, because we're going to fix it before it's going to cause you any problems. But at some point in time, we're going to fix it. But in the meantime, go ahead and continue to violate the law until we do. Right. That's on your client's advice. But the issue for purposes of unclean hands and in pari delicto is, you know, you ask the question, do they know they're violating the law? They know they're violating the law. I said, I don't think you win, at least not at the motion to dismiss stage, unless the complaints have alleged that these people were engaged in a Ponzi scheme. If they're just coming to your client for advice on how to fix these regulatory problems and your client gives bad advice and says, in the meantime, while we're fixing these problems, you guys can continue to conduct business as usual, I don't think you prevail under that scenario. Well, I'll go through the other examples. I do think, as you pointed out, it's very clear that they were engaged in a Ponzi scheme. If you look at the definition of a Ponzi scheme under California law, it's articulated in paragraph. What's the best? Just point me to the best allegation that just crystallizes this notion that they were taking money from new investors to pay off old investors. Well, there's – I mean, that's – among other things, that's the essence of what they said they were doing, that they were taking – you know, it's more than that. Where in the complaint? Don't just summarize. Where in the complaint is the best – give me the best allegation you've got on that point. I will get the specific paragraph reference. But over and over again, there are allegations. I have them both sitting right in front of me. I've tried to – they're long. I – I guess part of – Your Honor, part of the issue – And frankly, I didn't want to interrupt my colleague because I've really focused on that exact same thing about the complaint. But my worry is that the major part of your argument is about the plea, the plea to guilty to the charges rather than the complaint. Would you say that's true? The plea was for multiple securities, willful securities violations predominantly. First accounts, yes. Right. And that they willfully engaged in – That they used fraudulent practices to sell securities. Right. But part of the fraudulent practices were saying we're going to take these funds and you're going to have a secured interest in these various pieces of property and not using those funds for that purpose. What are they using it for instead? They're using it to pay off other investors. And that's – you know, that ties back as well to the question of whether there was a Ponzi scheme or not. I will say, too, that I don't think that unclean hands or imperial delicto is limited to whether or not there was a Ponzi scheme. If they're violating the law – and let me – if I can, I just want to run through the other examples. And then paragraph 9, I think it's of the EFMF complaint, is one example. But keep in mind the other allegations that are here as well. When they allege, for example, in paragraph 152 of the EFI complaint, that Brian K. failed to resign despite Guthin and Gutta's intent to continue to violate the law. Keep in mind the aiding and abetting allegations in both complaints. You don't aid and abet – just in concept, you don't aid and abet the behavior of people whose only interest is to comply with law. It doesn't work. You don't aid and abet at best negligence. Their whole theory in the aiding and abetting causes of action were and are that there were all kinds of breaches of fiduciary duty and nefarious conduct that were going on, and Brian K. worked with them. That's the definition under state law of what aiding and abetting is. You have to work with somebody who is complicit in the nefarious, illegal activity. It's completely inconsistent with the proposition that they are behaving with clean hands. You don't aid and abet someone who is acting appropriately. That's not a cause of action that works. Another allegation – What is the bottom line of the court's decision? In your view, what should be the bottom line? What, in your view, should be decided? The bottom line here is obviously that I believe that the bankruptcy court and the district court that entered the judgment should be affirmed. That the issues to the extent there are challenges to the behavior are best dealt with the other litigation that's going on by investors. From the standpoint of the trustee here, the trustee under Section 541 stands in the shoes of EFI. The complaint is rife with allegations about how EFI and EFMF were controlled by Yeguda. It's only officers and directors. It's exclusive owners. The sole corporate manager who controlled the business operations and were in sole control of EFI and EFMF. So imputation is not an issue. It's not been made an issue. And so, on one level, this case is really Guth and Yeguda versus Brian Cave. There's a separate case, all the investors against Brian Cave, and that's proceeded under state law. And that's out there. We're here talking about the trustees. Under the laws that exist now, the trustees stand in the shoes under Section 541. They are bound by, in an imperi delicto and an unclean hands case, unlike Kammerer, which is an estoppel case, which is a different analysis. They are bound, just like anybody else, to the doctrines of unclean hands and imperi delicto. California law between Chapman Blaine and Peregrine is very clear about unclean hands applying in context like this, and frankly more innocent context than the knowing misbehavior that's alleged throughout both complaints, and yet still the doctrine is applied. In Peregrine, it's applied to the trustee as well. And as a result, the unclean hands doctrine should be applied. The imperi delicto doctrine should be applied. The investor cases are separate. And as a result, this court should affirm, recognizing, as I say, there is a distinction between unclean hands and imperi delicto. I didn't get a chance to give you more detail about your question about the O'Melveny case, but there are a lot of reasons why this court should not extend O'Melveny to trustees, reasons that did not exist or were not faced by the court in O'Melveny at the time. And please do remember, O'Melveny was an estoppel case. It was not an unclean hands case, and it was not an imperi delicto case. Thank you, counsel. Thank you. Mr. Gabriel, I think you have an extra three minutes based on what I did with counsel. Thank you, Your Honor. I appreciate that. Your Honor, Larry Gabriel, on behalf of Mr. Jeremiahson, who is the Chapter 11 trustee for the Estate Financial, Inc. What I'd like to do, may it please the Court, what I'd like to do is respond to the Court's questions previously posed to counsel, and I will do that quickly. The Court asked whether or not this was a Ponzi scheme. It certainly had a flavor of a Ponzi scheme. Your Honor, it was not a Ponzi scheme. We, in fact, I believe there's a footnote in the complaint where we specifically say this is not a Ponzi scheme. And even if there was an inclination that there was a Ponzi scheme, that presents a factual issue which needs to be determined during the course of the trial. It is not something that can be determined at this time. In fact, most in-carry delicto cases are not right for decision based on the initial pleadings, but really most of the decisions go by way of summary judgment. So they've created an issue of fact. The inference must be drawn in favor of the plaintiff in this case. And therefore, even if they say, oh, this was a Ponzi scheme, we say it isn't, it creates an issue of fact. It has to go back down, and that issue has to be addressed. The court asked a question that I am very familiar with, and that is, well, didn't Gouth go to the bank and get a loan, and wasn't that a fraudulent conveyance? And the answer is yes. She did that. She went to the bank and got a loan and paid off her husband, who was a former partner of her in the business. And, in fact, the trustee, we sued on that fraudulent conveyance, and we resolved that case. But that issue did not infect the relationship as between Brian Cave and EFI. It had nothing to do with that relationship. While it was admittedly in the conduct of the business for which she was involved, it really didn't infect that relationship. She didn't go to Brian Cave and say, hey, what should I do about this loan? And they said, you know, go ahead and get it and give the advice. She did this all on her own. So I don't think that it infected the – Why would that – why would it matter whether she went to get advice? Well, all I'm saying is it didn't infect the relationship – their relationship as to what I should do with the business. You know – I mean, look, if – if this enterprise was being run just as a completely fraudulent venture, and all – I don't know the names of the principals, but the – Guth and Yaguta. Is Yaguta the woman? Guth is the – And I – Well, it's her son, so anybody gets more confusing. The lead person. I mean, if all that person is doing is pocketing all this money and defrauding investors, it doesn't seem to me it matters that she didn't go to the law firm to get advice about, hey, how can I better defraud everyone? But she didn't. She didn't pocket the money. There's no – Well, the $1.1 million that goes to the accessory, that's – I understand that. But that – but this is a case where there was $500 million involved. There was 350 properties. Maybe – I'm sorry, I got it backwards. 500 properties, $350 million involved. There are construction projects all up and down the West Coast where these funds were used. There were payments that were made to the investors as appropriate. A true Ponzi scheme has no underlying business or a relatively small business that supports the operation. That wasn't the case here. There was massive projects. It funded almost every development project – EFI funded almost every development project in the – on the West Coast. And we can prove that at trial. So, again, I think what it creates is an issue of fact that needs to go back down. With respect to the reasoning of the – How do you define the issue of fact? How do you define the issue of fact? I'm sorry, Your Honor? How do you define the issue of fact that is created? The issue of fact is whether or not the business was a Ponzi scheme. And we contend that the proof will show that it was not. The – you asked, Your Honor, about the reasoning of the Bankruptcy Court. Well, it's nice, but it's not relevant. As we know, this Court reviews de novo on a motion to dismiss. And so while the Bankruptcy Court's reasoning may be interesting, I don't think that it's persuasive. And certainly was wrong in this particular case. You asked if the – if a client goes to the lawyer and for advice, whether or not – and I agree that the unclean hands does not apply. The Peterson-Winston-Strong case, I believe the dicta had it right. The Court said that – decided it's between the two types of cases, where a client goes to a law firm and says, I want you to form these corporations and I'm not going to give you full disclosure about my business, but go ahead and form it. The lawyers form the corporation. He uses those corporations for a Ponzi scheme. Yes, I would say perhaps imperi delicto applies. On the other hand, this is a full disclosure case. This is a case where they came to the lawyers and said, here's our books and records. Do an audit. Tell us – we're telling you everything that we're doing and we're going to rely on your advice. And please give us the right advice so that we don't have any problems. They were already facing problems. Not only did they do that, but they went out and got one of the foremost experts in real estate laws to help them in this process. And what they did, and what is so egregious about Brian Cave in this is, when they first got involved in this relationship in October of 06, Mr. Amber, one of the senior partners of Brian Cave and an ethics expert, came to the conclusion that there was criminal liability. And there is no allegation in the complaint that indicates that he – and there was no documents that we found that indicated that he or Brian Cave or Ms. Windler conveyed that information to the clients until it was way too late, until 2008. A year after a year – or a year and a half after the retention had taken place. Wouldn't that be the first thing that the lawyer should have done and said, you guys got a big problem here? That doesn't exist. And that is wrong. And if we go to imperi delicto, which is a weighing of the equities between the parties, there is no question that Brian Cave's conduct is the worst. The worst in the world, according to Mr. Rosen. And I agree with him. Not only was that part unconscionable, but later on, after the criminal investigation is going on, Catherine Windler sends out an email to Brian Cave and says, I got a great new retention. My clients – we have new clients. New clients. They weren't, of course, new. We have new clients that have got criminal charges in Yahoo. I get to generate more business. That is unconscionable. That is the worst lawyering in the world. I would be throwing up in the bathroom. I would be going to get my own criminal lawyer if I was her. But no, that's not what she did. She goes ahead and counts to the law firm, wow, look at this new retention we have. Isn't that great? That is what imperi delicto is all about, and that is bad conduct. Thank you. I think we've got the end of that argument. I gave you your extra three. And I appreciate it, Your Honor. Thank you very much. I appreciate the court's attention. Thank you. Thank you very much. These cases, 12-560-209 and 12-561-011 are submitted.
judges: Farris, Smith, Watford